IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK E. SUNNERGREN,<br><br>        Plaintiff,<br><br>  vs.<br><br>CMO E. TOOTELL, et al.,<br><br>        Defendants. | No. C 12-0979 LHK (PR)<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; REFERRING CASE TO SETTLEMENT PROCEEDINGS<br><br>(Docket Nos. 30, 38) |

Plaintiff, a state prisoner proceeding *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 alleging that several San Quentin State Prison ("SQSP") officials were deliberately indifferent to his serious medical needs. Defendants have moved for summary judgment. Plaintiff has filed an opposition, and defendants have filed a reply.[1] Having carefully considered the papers submitted, the court GRANTS in part and DENIES in part defendants' motion for summary judgment, for the reasons set forth below.

**BACKGROUND**

The following facts are taken in the light most favorable to plaintiff, and are undisputed unless otherwise indicated.

---

[1] Defendants' motion for administrative relief is DENIED. Both parts of plaintiff's opposition are deemed timely filed. Defendants' reply, filed on September 9, 2013, is deemed timely filed.

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring Case to Settlement Proceedings
G:\PRO-SE\LHK\CR.12\Sunnergren979msj.wpd

1    On March 16, 2009, plaintiff saw Dr. Alvarez, and complained of a broken wrist, extreme
2 back pain, and degenerative joint disease of the spine. (Compl. at 3; Pl. Depo. at 41.) Plaintiff
3 told Dr. Alvarez that he thought his wrist was broken, and that he was in severe pain. (Pl. Depo.
4 at 41.) Plaintiff requested, but was denied, an x-ray of his wrist. (Compl. at 3.) Dr. Alvarez
5 prescribed plaintiff gabapentin, acetaminophen, Remeron, Prozac and Tylenol. (Pl. Depo. at 45.)
6    On April 28, 2009, plaintiff saw defendant Dr. Wu ("Dr. Wu") for treatment of his
7 chronic pain. (Compl. at 3; Pl. Depo. at 52.) Plaintiff told Dr. Wu that he was in severe pain, his
8 wrist was throbbing, and plaintiff believed it to be broken. (Pl. Depo. at 53.) Plaintiff showed
9 Dr. Wu his transfer records from the County Jail, which indicated that plaintiff had a possible
10 break in his wrist, and that plaintiff was on pain medication. (*Id.* at 73.) Dr. Wu examined
11 plaintiff by applying pressure on various points on plaintiff's wrist to gauge plaintiff's response.
12 (Wu Decl. at ¶ 4.) Plaintiff screamed in pain the four or five times Dr. Wu poked him on the
13 right side of plaintiff's back, which was the most sensitive part of his back, and screamed in pain
14 when Dr. Wu twisted plaintiff's right wrist. (Pl. Depo. at 57-59.) Plaintiff believed Dr. Wu was
15 doing a regular exam and did not think that Dr. Wu was poking or manipulating him excessively.
16 (*Id.* at 67.) Despite plaintiff's audible discomfort, Dr. Wu merely commented, "normal pain."
17 (Compl. at 3.) Dr. Wu believed plaintiff's discomfort was normal pain for someone with a wrist
18 sprain. (Wu Decl. at ¶ 5.) Plaintiff's responses to the examination were inconsistent, which
19 caused Dr. Wu to doubt the severity of plaintiff's complaints. (*Id.*) According to Dr. Wu,
20 plaintiff did not appear to be in pain in general. (*Id.*) Dr. Wu did not order an x-ray for
21 plaintiff's wrist and refused to refill plaintiff's pain medication, i.e., baclofen, gabapentin, and
22 narcotics. (Compl. at 3; Doc. No. 37, Ex. L; Wu Decl. at ¶ 6.) Defendant Chief Medical Officer
23 Tootell ("CMO Tootell") denied plaintiff's appeal complaining of Dr. Wu's treatment of
24 plaintiff. (Compl. at 3.)
25    On June 12, 2009, plaintiff was able to get Dr. Pachynski to order an x-ray of plaintiff's
26 wrist, and the x-ray confirmed that plaintiff's wrist was broken. (*Id.*)
27    On September 3, 2009, plaintiff saw an orthopedic specialist, Dr. Matan. (*Id.*) Dr. Matan
28

found several serious and chronic medical conditions requiring immediate chronic care and pain management. (Compl. at 3A, Ex. A.) Dr. Matan felt that it was too late to repair plaintiff's wrist, and ordered narcotic pain relievers for bone pain, and gabapentin for nerve pain. (Compl. at 3A.) Dr. Matan also ordered plaintiff to undergo an operation to help relieve some of the chronic pain in plaintiff's wrist that prevented him from gripping and writing. (*Id.*)

In September 2009, plaintiff's chronic care physician changed from Dr. Wu to defendant Dr. Espinoza-Marcus ("Dr. Espinoza"). (Espinoza Decl. at ¶ 3.) Initially, Dr. Espinoza saw plaintiff on September 11, 2009. (*Id.* at ¶ 4.) Dr. Espinoza prescribed MS Contin, i.e., morphine, for wrist pain. (*Id.*) In October and November, 2009, Dr. Espinoza increased the dosages for morphine and gabapentin because plaintiff told her the dosages were not enough. (*Id.*) On January 28, 2010, plaintiff wanted to add methadone, but Dr. Espinoza told him that he could not have both methadone and morphine, so plaintiff requested to switch to methdaone. (*Id.* at ¶ 5.) Dr. Espinoza granted his request in March 2010. (*Id.*) Dr. Espinoza also suggested that plaintiff consider surgery to address plaintiff's wrist pain, but he declined. (*Id.* at ¶ 6.)

On May 25, 2010, defendant LVN Lacy ("LVN Lacy") was distributing medicine to the inmates, and refused to accept a sick-call slip from plaintiff, who requested a refill of plaintiff's asthma medication. (Compl. at 3D.) Plaintiff demanded a refill of his asthma medication and informed LVN Lacy that it was her job to "do this." (*Id.*) LVN Lacy threatened plaintiff, "How about I cut off all your meds, hmm?" (*Id.* at 3E.) Later that day, LVN Lacy returned and said to plaintiff, "Oh, you're not going to like it one bit!" (*Id.*)

The following day, on May 26, 2010, defendant Dr. Grant ("Dr. Grant") signed an order discontinuing plaintiff's receipt of narcotic medication. (Grant Decl. at ¶ 3.) LVN Lacy had submitted a report to Dr. Grant that indicated that plaintiff had "diverted his medication." (*Id.* at ¶ 4.) Because Dr. Grant was filling in for plaintiff's regular physician, Dr. Espinoza, that day, Dr. Grant was responsible for handling this issue. (*Id.*) Per prison policy, when an inmate is found to be diverting medication, narcotics and other restricted medications are discontinued and other alternatives are explored. (*Id.* at ¶ 5.) Nurse Parks brought plaintiff his medication and

1  informed him that his methadone pain medication had been discontinued. (Compl. at 3E.)

2  On June 4, 2010, while plaintiff was in the bathroom, he collapsed on to the floor.
3  (Compl. at 3E.) Plaintiff was raced to the Trauma Center. (*Id.* at 3E - 3F.) Later that day,
4  plaintiff saw Dr. Espinoza, who said she was unable to do anything to help plaintiff because Dr.
5  Grant had ordered plaintiff's methadone medication to be stopped "as a punishment for hoarding
6  medication." (*Id.* at 3F.) Dr. Espinoza offered to give plaintiff a temporary chrono so that
7  plaintiff could be housed on the first floor rather than the third floor so that plaintiff would not
8  have to climb two flights of stairs, however, plaintiff stated that he preferred to be on the third
9  floor. (Grigg Decl., Ex. C at 45.)

10  Plaintiff asserts that LVN Lacy convinced Dr. Grant to cut off plaintiff's methadone
11  medication. (Compl. at 3F.) Plaintiff refutes that he had ever been accused of hoarding prior to
12  the cessation of methadone. (*Id.* at 3E - 3F.) As a result of not receiving the methadone,
13  plaintiff claims that he fell or collapsed on June 4, June 18, and June 26, 2010. (*Id.* at 3f.)
14  Plaintiff asserts that for two years, he was refused narcotic pain medication based on this false
15  accusation of hoarding. (*Id.*) Further, plaintiff states that Dr. Espinoza would tell him that she
16  knew plaintiff needed the narcotic pain medication, but because plaintiff treated LVN Lacy
17  "poorly" and was hoarding his medication, the narcotics were being withheld as punishment.
18  (*Id.*)

19  In September 2010, Dr. Espinoza ordered an x-ray for plaintiff's big toe, which was
20  causing him pain. (*Id.* at 3I.) The x-ray showed severe damage and bone on bone osteophytosis.
21  (*Id.*, Ex. B.) The podiatrist ordered pain medication, among other things, but Dr. Espinoza
22  cancelled the order for narcotic pain medication. (*Id.* at 3J.)

23  Plaintiff asserts that the defendants' failure to properly treat his condition and manage his
24  pain resulted in further significant injury and severe pain. (*Id.* at 3A.)

25  **ANALYSIS**

26  A.   <u>Standard of Review</u>

27  Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

28

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring Case to Settlement Proceedings
G:\PRO-SE\LHK\CR.12\Sunnergren979msj.wpd           4

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring Case to Settlement Proceedings
G:\PRO-SE\LHK\CR.12\Sunnergren979msj.wpd           4

that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152,

1158 (9th Cir. 1999).

B.     Plaintiff's Claim

Liberally construed, plaintiff claims that each defendant was deliberately indifferent to his serious medical needs by delaying his treatment for his back or wrist pain, and discontinuing and failing to renew his prescriptions for certain pain medications. Defendants argue that they are entitled to judgment as a matter of law because the evidence is undisputed that none of them had the requisite culpable state of mind to meet the deliberate indifference standard.

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *See McGuckin*, 974 F.2d at 1059.

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

1.     Dr. Wu

Plaintiff claims that Dr. Wu was deliberately indifferent for refusing to order further diagnostic testing regarding plaintiff's wrist – specifically, an x-ray. (Pl. Depo. at 75.) Plaintiff further alleges that Dr. Wu exhibited deliberate indifference by failing to renew plaintiff's requested pain medication. (*Id.* at 76.) Plaintiff argues that the delay of treatment caused him to suffer muscle atrophy, permanent psychological damage, and panic attacks. (*Id.* at 77.)

1    Dr. Wu stated that, at the time, he believed plaintiff's requests for baclofen, gabapentin,
2 and narcotics indicated drug-seeking behavior because plaintiff's requests did not match up with
3 Dr. Wu's findings upon plaintiff's physical examination. (Wu Decl. at ¶ 6.) Moreover, the
4 institution had begun a policy of not prescribing baclofen or gabapentin for non-FDA approved
5 uses. (*Id.*) Instead, institution doctors were supposed to first try Tylenol or ibuprofen for
6 chronic pain before prescribing narcotics because of the abuse potential with narcotic drugs.
7 (*Id.*) Dr. Wu's prescription for Tylenol was an attempt to relieve plaintiff's complaints of
8 chronic back and wrist pain. (*Id.* at ¶ 7.) Plaintiff was directed to return in two months to check
9 his progress and be re-assessed. (*Id.*) Dr. Wu further explained that he did not order an x-ray for
10 plaintiff's wrist because, based on his examination, Dr. Wu believed plaintiff's wrist pain was
11 due to a sprain,improve over time. (*Id.*)

12   Plaintiff's allegation that Dr. Wu failed to order an x-ray for plaintiff's wrist, or further
13 diagnostic testing is, at most, negligence. "Mere negligence in diagnosing or treating a medical
14 condition, without more, does not violate a prisoner's Eighth Amendment rights." *Toguchi v.*
15 *Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal quotations and citation omitted). Here,
16 there is an absence of evidence that Dr. Wu knew plaintiff faced a substantial risk of harm, and
17 consciously disregarded that risk by failing to order an x-ray for plaintiff's wrist. *See Farmer*,
18 511 U.S. at 837. The evidence is undisputed that, based on Dr. Wu's physical examination, Dr.
19 Wu believed plaintiff suffered from a wrist sprain rather than a broken wrist. (Wu Decl. at ¶¶ 5,
20 7.) Though plaintiff believes Dr. Wu should have ordered the x-ray, the law is clear that a
21 difference of opinion regarding treatment does not give rise to a § 1983 claim. *See Franklin*, 662
22 F.2d at 1344. In order to prevail on a claim involving choices between alternative courses of
23 treatment, plaintiff must show that the course of treatment that Dr. Wu chose was medically
24 unacceptable under the circumstances, and that he chose this course in conscious disregard of an
25 excessive risk to his health. *See Toguchi*, 391 F.3d at 1058. This, he has failed to do.

26   Similarly, plaintiff's claim that Dr. Wu failed to dispense stronger pain medication
27 cannot survive summary judgment. Dr. Wu initially prescribed Tylenol to address plaintiff's
28

pain. Plaintiff argues that he should have received stronger pain medication. However, again, plaintiff fails to support that allegation with any evidence. Specifically, plaintiff does not show that the failure to give stronger pain medication was medically unacceptable under the circumstances. *See id.* In addition, it appears that Dr. Wu only treated plaintiff on this one particular day. At most, this is an isolated occurrence of neglect, which does not set forth a viable deliberate indifference claim. *See O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir.1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea and pains is not constitutional violation; it may constitute grounds for medical malpractice but does not rise to level of unnecessary and wanton infliction of pain).

Accordingly, the court GRANTS defendants' motion for summary judgment as to Dr. Wu.[2]

    2.    <u>Dr. Espinoza</u>

Plaintiff claims that Dr. Espinoza was deliberately indifferent to his serious medical needs because she did not override Dr. Grant's order to discontinue plaintiff's narcotic medications for pain even though she knew that the methadone was helpful in managing plaintiff's chronic pain. (Doc. No. 41 at 8-9.)

The evidence is undisputed that Dr. Espinoza regularly treated plaintiff from September 2009 through January 2011. (Espinoza Decl. at ¶ 3; Grigg Decl., Ex. C at 27-68.) Prior to June 2010, Dr. Espinoza prescribed a variety of medications to plaintiff to relieve his chronic pain, including morphine and methadone. (Decl. Espinoza at ¶¶ 4-5.) In fact, at each visit, plaintiff requested, and received, increases in his medication dosages, and requested methadone in addition to morphine. (*Id.* at ¶¶ 4-5.) On March 24, 2010, Dr. Espinoza discussed the possibility of wrist surgery with plaintiff, which was recommended by the orthopedic surgeon in September 2009 (Doc. No. 40, Ex. J), but plaintiff declined, stating that he wanted a different kind of surgery that he had discussed with his mother. (Decl. Espinoza at ¶ 6; Grigg Decl., Ex. C at 54.)

---

[2] Because the court grants summary judgment as to Dr. Wu on the merits, the court finds it unnecessary to address defendants' argument that Dr. Wu is entitled to qualified immunity.

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring Case to Settlement Proceedings
G:\PRO-SE\LHK\CR.12\Sunnergren979msj.wpd     8

1  Plaintiff states that he was treated with "courtesy and care" by Dr. Espinoza. (Doc. No. 41 at 3.)
2  At the end of May 2010, however, Dr. Grant ordered plaintiff's narcotics prescriptions to be
3  discontinued based of an accusation that plaintiff was hoarding his medication. (Grigg Decl.,
4  Ex. C at 48.)  Because of that order, and due to prison policy, Dr. Espinoza was no longer
5  permitted to prescribe narcotics. (Espinoza Decl. at ¶ 10; Pl. Decl. at 96.)  Plaintiff conceded
6  that Dr. Espinoza appeared sympathetic to his plight, but, based on the institution's policy, she
7  was unable to renew the narcotics prescriptions. (Pl. Decl. at 96.)

8  In this case, plaintiff cannot show that Dr. Espinoza disregarded an excessive risk to
9  plaintiff's health by refusing to renew the narcotics.  There is no evidence that Dr. Espinoza
10 knew that plaintiff faced a substantial risk of harm if he no longer received narcotics medication,
11 or that she failed to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 837.  Specifically,
12 Dr. Espinoza did not believe that the lack of narcotics would cause a substantial risk of serious
13 harm, and instead, she provided plaintiff with alternative relief. (Espinoza Decl. at ¶ 9.)  Dr.
14 Espinoza understood that if an inmate were misusing narcotics medications, the risk of
15 continuing to give narcotics medications to that inmate far outweighed the benefit due to the
16 possibility of fatal overdose. (*Id.* at ¶¶ 8-9.)  Dr. Espinoza continued to have follow-up visits
17 with plaintiff; recommended alternatives such as participating in physical therapy; encouraged
18 plaintiff to have surgery that would reduce or eliminate the wrist pain; and prescribed Tylenol,
19 anti-inflammatory and neuropathic pain medication, amitriptyline (another pain medication), and
20 increased plaintiff's dosage for gabapentin. (*Id.* at ¶¶ 10-12.)  Moreover, even though plaintiff
21 believes the narcotics medications were the most effective to treat his pain, in order to defeat
22 summary judgment, plaintiff must show that the course of treatment that Dr. Espinoza chose was
23 medically unacceptable under the circumstances, and that she chose this course in conscious
24 disregard of an excessive risk to his health. *See Toguchi*, 391 F.3d at 1058.  Here, on the
25 contrary, because Dr. Espinoza was aware that the order to discontinue narcotics was based on
26 an observation of diverting medication, her decision to stop giving narcotics – even if it were not
27 required by prison policy – was reasonable based on the potential risks of narcotics abuse.
28

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring Case to
Settlement Proceedings
G:\PRO-SE\LHK\CR.12\Sunnergren979msj.wpd            9

1  Based on this record, the court finds that plaintiff has not presented evidence that precludes
2  summary judgment as to Dr. Espinoza.
3        Accordingly, defendants' motion for summary judgment as to Dr. Espinoza is
4  GRANTED.[3]
5        3.     Dr. Grant
6        Plaintiff claims that, on May 26, 2010, Dr. Grant discontinued plaintiff's methadone
7  prescription as punishment for an alleged "diversion" of medication. (Doc. No. 41 at 7; Grant
8  Decl. at ¶ 3.) On that day, LVN Lacy had submitted a report to Dr. Grant that indicated that
9  plaintiff had "diverted his medication." (Grant Decl. at ¶ 4.) Per prison policy, when an inmate
10 is found to be diverting medication, narcotics and other restricted medications are discontinued
11 and other alternatives are explored. (*Id.* at ¶ 5.) Dr. Grant did not believe that discontinuation
12 would cause a substantial risk of serious harm because the methadone prescribed to plaintiff was
13 a comparatively low dose, and the risks of misuse were more serious than the risk of discomfort
14 plaintiff would suffer with discontinuance. (*Id.* at ¶ 7.)
15       Viewing the facts in the light most favorable to plaintiff, the court concludes that plaintiff
16 has not shown evidence that precludes summary judgment for Dr. Grant. Aside from plaintiff's
17 unsupported accusation that Dr. Grant discontinued plaintiff's narcotics medication as a
18 "personal favor" to LVN Lacy, plaintiff has provided no evidence disputing Dr. Grant's
19 statements. In light of the undisputed fact that Dr. Grant was told that plaintiff had been
20 observed diverting his medication, pursuant to prison policy, Dr. Grant was required to
21 discontinue restricted medications, such as narcotics. (Grant Decl. at ¶¶ 4-5.) Dr. Grant further
22 reasoned that the discontinuation of the methadone was appropriate because the risk of misuse,
23 based on the report of diversion, was potentially more serious than the risk of discontinuance,
24 especially considering that Dr. Espinoza would follow-up to provide alternative treatments for
25 plaintiff's pain management. (*Id.* at ¶ 7.) That plaintiff believed his narcotics prescriptions were

---

[3] Because the court grants summary judgment as to Dr. Espinoza on the merits, the court finds it unnecessary to address defendants' argument that Dr. Espinoza is entitled to qualified immunity.

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring Case to Settlement Proceedings
G:\PRO-SE\LHK\CR.12\Sunnergren979msj.wpd    10

most effective to his pain management is insufficient to defeat summary judgment. *See Franklin*, 662 F.2d at 1344 ("A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim."). Based on this record, plaintiff has not demonstrated that there is a genuine issue of material fact that Dr. Grant's decision to discontinue plaintiff's narcotics was medically unacceptable under the circumstances, and that he chose this course in conscious disregard of an excessive risk to plaintiff's health. *See Toguchi*, 391 F.3d at 1058.

Accordingly, defendants' motion for summary judgment as to Dr. Grant is GRANTED.[4]

### 4. <u>LVN Lacy</u>

Plaintiff claims that LVN Lacy falsely accused him of attempting to hide a methadone pill, knowing that narcotics prescriptions would be discontinued for plaintiff, because he demanded that she re-fill his asthma prescription. (Compl. at 3D-3E.) Plaintiff states that when he insisted LVN Lacy receive plaintiff's sick-call slip, LVN Lacy became rude and acted as if she was in a hurry. (Pl. Depo. at 120.) Plaintiff states that as he was dumping out his pills, one pill fell off the bed. However, states plaintiff, it must have been one of the psychiatric pills and not the methadone pill because the methadone pill was crushed and in a sealed packet. (*Id.* at 123.) Plaintiff believes that LVN Lacy knew he was not trying to hide the pill, but she wanted to punish plaintiff. (*Id.* at 125.) LVN Lacy accused plaintiff of trying to hide his pills, but plaintiff denied it. (*Id.* at 121.) Then, plaintiff scooped up all of his pills, took his medication in front of LVN Lacy, and returned the packages to the pill envelope to return to her. (*Id.*) Plaintiff reminded LVN Lacy that if she did not turn in plaintiff's sick call slip to receive his asthma medication refill, he would file a grievance against her. (*Id.* at 121-22.) LVN Lacy threatened plaintiff, "How about I cut off all your meds, hmm?" (*Id.* at 121, 125; Compl. at 3E.) Later that day, LVN Lacy returned and said to plaintiff, "Oh, you're not going to like it one bit!" (Compl. at 3E; Pl. Depo. at 127.)

---

[4] Because the court grants summary judgment as to Dr. Grant on the merits, the court finds it unnecessary to address defendants' argument that Dr. Grant is entitled to qualified immunity.

1    LVN Lacy's version of the facts are markedly different. According to LVN Lacy, on
2 May 25, 2010, she thought plaintiff intentionally tried to push one of his pills to the side of the
3 bunk so that it would fall off, and onto an area where she could not see. (Lacy Decl. at ¶ 10.)
4 LVN Lacy warned plaintiff verbally not to do that again and made a notation of her observation.
5 (*Id.*, Grigg Decl., Ex. C at 50.) The following day, LVN Lacy gave plaintiff his medication and
6 noticed plaintiff open one packet of methadone, and try to hide the other packet. (*Id.* at ¶ 11.)
7 LVN Lacy informed plaintiff that she would have to inform a doctor about his attempt to divert
8 medicine. (*Id.*) Plaintiff became angry and began calling LVN Lacy names. (*Id.* at ¶ 13.) LVN
9 Lacy filed a report and informed Dr. Grant, the physician on duty for that unit on that day. (*Id.*
10 at ¶ 13; Grigg Decl, Ex. C at 49.)

   In light of these disputed facts, and recognizing that the court must view the disputed facts in the light most favorable to plaintiff, defendants are not entitled to summary judgment as to LVN Lacy. *See McGuckin*, 974 F.2d at 1062 (noting that indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (stating that if it were proved at trial that doctors denied a prisoner on dialysis a kidney transplant because of personal animosity rather than in the exercise of honest medical judgment, and that the delay in performing the transplant was "medically unacceptable," that would demonstrate deliberate indifference).

   Alternatively, defendants argue that LVN Lacy is entitled to qualified immunity. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court considering a claim of qualified immunity must determine: (1) whether the plaintiff has alleged the deprivation of an actual constitutional right, and (2) whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

   Here, plaintiff claims that LVN Lacy orchestrated a plan to prohibit plaintiff from

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring Case to Settlement Proceedings
G:\PRO-SE\LHK\CR.12\Sunnergren979msj.wpd     12

receiving narcotics pain medication for plaintiff's chronic pain in order to punish him. Viewing the facts in the light most favorable to plaintiff, the court concludes that LVN Lacy is not entitled to qualified immunity. *See Jackson*, 90 F.3d at 332 (rejecting defendants' claim for qualified immunity based on plaintiff's allegation that "the doctors chose to deny him the opportunity for a kidney transplant, not because of an honest medical judgment, but on account of personal animosity").

Accordingly, defendants' motion for summary judgment is DENIED as to LVN Lacy.

4,   CMO Tootell

Plaintiff claims that CMO Tootell was deliberately indifferent to his medical needs because he denied plaintiff's inmate grievance regarding plaintiff's visit with Dr. Wu. (Compl. at 3.) Plaintiff never had any interaction with CMO Tootell in person. (Pl. Decl. at 100-01.) Plaintiff further states that CMO Tootell "should have known" if she did not actually know that Dr. Wu was violating plaintiff's rights. (*Id.* at 104-05.) The only evidence that plaintiff has that CMO Tootell actually knew anything about plaintiff's situation was that CMO Tootell reviewed his grievances. (*Id.* at 105, 110.) Finally, plaintiff admits that he named CMO Tootell in this lawsuit on the basis that she was a supervisor and was responsible for those under her. (*Id.* at 106.)

First, there is no constitutional right to a prison administrative appeal or grievance system. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003). Thus, to the extent plaintiff is challenging the denial of his administrative grievance, defendants' motion for summary judgment as to CMO Tootell is GRANTED.

Plaintiff's situation is distinguishable from that presented in *Jett v. Penner*, 439 F.3d. 1091, 1098 (9th Cir. 1996). In *Jett*, the defendant supervisors stated that they were unaware of the inmate's condition and therefore, could not have been deliberately indifferent to his medical needs. However, the Ninth Circuit reversed, finding that the inmate was entitled to the inference that supervisors were aware of the inmate's complaints because he wrote letters to them. "As prison administrators, [the supervisors] are liable for deliberate indifference when they

knowingly fail to respond to an inmate's requests for help." *Id.* Here, CMO Tootell did not knowingly fail to respond to plaintiff's request for help via an inmate grievance. Rather, CMO Tootell reviewed plaintiff's grievance, and denied plaintiff's requests for an x-ray and additional medications. (Doc. No. 40, Ex. M at 28-29; Tootell Decl. at ¶ 5.) Based on CMO Tootell's review, Dr. Wu's evaluation was appropriate, and CMO Tootell knew that plaintiff was also seeing other providers for follow-up care. (Tootell Decl. at ¶ 6.) Plaintiff has not presented evidence that there is a genuine issue of material fact that CMO Tootell's denial of plaintiff's requests was medically unacceptable under the circumstances, and that he chose this course in conscious disregard of an excessive risk to plaintiff's health. *See Toguchi*, 391 F.3d at 1058.

Second, a supervisor may be liable under section 1983 upon a showing of (1) personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). Supervisory defendants are entitled to qualified immunity where the allegations against them are simply "bald" or "conclusory" because such allegations do not plausibly establish the supervisors' personal involvement in their subordinates' constitutional wrong. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (noting no vicarious liability under Section 1983 or *Bivens* actions). Thus, it is insufficient for a plaintiff only to allege that CMO Tootell generally failed to supervise her subordinates. (Doc. No. 40 at 10.)

Accordingly, defendants' motion for summary judgment as to CMO Tootell is GRANTED.[5]

C.     Referral to Pro Se Prisoner Settlement Program

Prior to setting this matter for trial and appointing pro bono counsel to represent plaintiff for that purpose, the court finds good cause to refer this matter to Judge Vadas pursuant to the Pro Se Prisoner Settlement Program for settlement proceedings on the claim set forth above. The proceedings will consist of one or more conferences as determined by Judge Vadas. The

---

[5] Because the court grants summary judgment as to CMO Tootell on the merits, the court finds it unnecessary to address defendants' argument that CMO Tootell is entitled to qualified immunity.

conferences shall be conducted with LVN Lacy, or her representatives, attending by videoconferencing if they so choose. If these settlement proceedings do not resolve this matter, the court will then set this matter for trial and consider a motion from plaintiff for appointment of counsel.

## CONCLUSION

1. Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Summary judgment is GRANTED as to Dr. Wu, Dr. Grant, Dr. Espinoza, and CMO Tootell. Summary judgment is DENIED as to LVN Lacy.

2. The instant case is REFERRED to Judge Vadas pursuant to the Pro Se Prisoner Settlement Program for settlement proceedings on the remaining claim in this action, as described above. The proceedings shall take place within **one-hundred twenty (120) days** of the filing date of this order. Judge Vadas shall coordinate a time and date for a settlement conference with all interested parties or their representatives and, within **ten (10) days** after the conclusion of the settlement proceedings, file with the court a report regarding the prisoner settlement proceedings. If these settlement proceedings do not resolve this matter, plaintiff can file a renewed motion for appointment of counsel, and the court will then set this matter for trial.

3. The clerk of the court shall mail a copy of this order to Judge Vadas in Eureka, California.

4. The instant case is STAYED pending the settlement conference proceedings. The clerk shall ADMINISTRATIVELY CLOSE this action until further order of the court.

IT IS SO ORDERED.

DATED: 1/22/14

*Lucy H. Koh*
LUCY H. KOH
United States District Judge